NEWARK BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; Jersey City Branch, National Association for the Advancement of Colored People; New Jersey State Conference, National Association for the Advancement of Colored People; National Association for the Advancement of Colored People,

v.

TOWN OF HARRISON, NEW JERSEY.

NEWARK BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; Paterson Branch, National Association for the Advancement of Colored People; Passaic Branch, National Association for the Advancement of Colored People; Jersey City Branch, National Associa-

tion for the Advancement of Colored People; New Jersey State Conference, National Association for the Advancement of Colored People; National Association for the Advancement of Colored People,

v.

TOWNSHIP OF HARRISON, NEW JERSEY.

No. 90–5897.

United States Court of Appeals, Third Circuit.

Argued April 3, 1991.

Decided July 19, 1991.

Jonathan M. Hyman, Newark, N.J., David L. Rose (argued), Joshua N. Rose, Washington, D.C., Dennis C. Hayes, Gen. Counsel, Everald F. Thompson, Asst. Gen. Counsel, N.A.A.C.P./SCF, Baltimore, Md., for appellees.

Gregory J. Castano (argued), Kenneth D. McPherson, Jr., Robert J. Donaher, Waters, McPherson & McNeill, Secaucus, N.J., for appellant.

Gerald D. Miller (argued), Mildred S. Kwozko, Miller, Meyerson, Schwartz & Corbo, Jersey City, N.J., for amicus-appellant.

Before MANSMANN and HUTCHINSON, Circuit Judges, and O'NEILL, District Judge.[*]

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this Title VII disparate impact action, we are called upon to address various issues requiring interpretation of the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), the most novel of which is the quantum and quality of evidence which a defendant must produce in order to meet its burden of production with respect to "business justification." Specifically, we must determine whether the district court erred in holding that the Town of Harrison, New Jersey violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, when it enacted and enforced a municipal ordinance which provided that "no person shall be an eligible applicant for any position of employment in the classified civil service of the Town who is not a resident of the Town." The district court's holding rested upon the finding that Harrison's residency requirements were, in substantial part, responsible for a "marked disparity between

---

[*] Honorable Thomas J. O'Neill, Jr. of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

the pool of qualified black applicants for municipal jobs in Harrison and the actual black representation among Harrison's employees." *N.A.A.C.P., Newark Branch v. Town of Harrison N.J.*, 749 F.Supp. 1327, 1337 (D.N.J.1990).

Finding no error in the district court's application of the law or in its formulation of the remedy, we will affirm.

### I.

Because the factual underpinnings of this case are detailed in the opinion of the district court, we set forth only those facts necessary to establish a backdrop against which the legal challenges raised here may be evaluated.

Harrison is a small industrial community located in Hudson County, New Jersey. "Geographically, it is closely aligned with immediately adjacent Essex County to the west and could very well be considered an extension of the City of Newark which it abuts." *N.A.A.C.P,* 749 F.Supp. at 1331. For as long as the Town's witnesses could remember, the Town of Harrison has adhered to a policy of limiting hiring for its police, fire, and non-uniformed positions to town residents. With the exception of a non-resident black woman whom the Board of Education hired in a highly-skilled educational specialty, the Town of Harrison has never hired a non-resident or a black. *Id.* at 1329.

In 1947, Harrison brought its workforce within the terms of the New Jersey Civil Service Act, now codified at N.J.S.A. 11A:1–1, *et seq.*, which charges the New Jersey Department of Personnel with establishing titles in the classified service, determining the need for competitive examinations, establishing and administering competitive examinations, establishing, consolidating, using and canceling lists of eligible applicants, and with certifying highest-ranking applicants on the eligibility lists to appropriate municipal officers. *Id.*

In 1978, the New Jersey Act concerning Residence Requirements for Municipal and County Employees modified the law to permit municipalities to "require [that] ... all officers and employees employed by the local unit ... be bona fide residents therein." N.J.S.A. 40A:9–1.3. The Act also provides that a municipality is authorized "to limit the eligibility of applicants for positions and employment in the classified service of such local unit to residents of that local unit." N.J.S.A. 40A:9–1.4. The reach of the Act is limited in that residency requirements are specifically made "subject to any order issued by any court, or by any State or Federal agency pursuant to law, with respect to a requirement to eliminate discrimination in employment based upon race, creed, color, national origin, ancestry, marital status or sex." N.J.S.A. 40A:9–1.-10.[1]

Pursuant to the Act, on October 6, 1981, Harrison adopted Ordinance 747 containing the following provisions:[2]

Paragraph 1—"All officers and employees of the Town shall, as a condition of employment, be bona fide residents of the Town...."

Paragraph 2—"No person shall be an eligible applicant for any position of employment in the classified civil service of the Town who is not a resident of the Town." This requirement could be waived in the event of a Civil Service Commission determination that an insufficient number of qualified residents existed for the positions available.

---

**1.** The New Jersey Residence Act did not apply to police and fire department employees as, in 1972, the New Jersey legislature enacted provisions forbidding residency requirements for these employment categories. *See* N.J.S.A. 40A:14–122.1 (police officers), and N.J.S.A. 40A:14–9.1 (fire fighters). "[W]hile a municipality cannot require its police and fire personnel to live within its borders, it can [under the provisions of N.J.S.A. 40A:14–123.1a] limit *applicants* for police and fire positions to its own residents." *N.A.A.C.P.,* 749 F.Supp. at 1330 (em-

phasis added). Harrison does impose a residency requirement in the case of applicants for uniformed positions.

**2.** The record contains no firm data regarding the number of municipalities state-wide which have enacted residency requirements authorized by statute. The defendants contend that "most" municipalities have adopted restrictive ordinances.

Paragraph 3—"All non-residents appointed to positions and employments after the effective date of the Ordinance shall become bona fide residents of the Town within one year of their appointment...."

Paragraph 4—"Failure ... to maintain residency in the Town shall be cause for removal or discharge from service."

Paragraph 5—"Whenever the Town Council determines by a majority vote of its full membership that there are not residents qualified for specific available positions, the Town may advertise for other qualified applicants and may classify these applicants in a specified order of residential preference. Non-residents hired must become bona fide within six months of appointment."

Paragraph 6—Where the position requires talents and skills "not likely to be found among the residents of the Town, such position or employment may be filled without regard to residency."

Paragraph 7—"Preference in promotion shall be given to officers and employees who are bona fide residence [sic] of the Town."

Paragraph 8—"This Ordinance shall not apply to members of the police department or fire department."

Harrison has limited municipal hiring in accordance with Ordinance 747 and with the state statutory provisions governing the hiring of police and fire fighters. Non-uniformed employees, laborer or clerk-typist positions, are most often filled by word-of-mouth or through informal application. These positions are non-competitive and do not involve an examination. Rather, appointees occupy a probationary status for a period of time, after which they are formally appointed pursuant to N.J.A.C. 4A:3–1.-2(a).

Uniformed employee positions, on the other hand, are filled through an examination process administered by the State Department of Personnel. The Department, at Harrison's direction, classifies applicants according to their municipal residency. The 1988 application forms distributed to those wishing to take the state-wide police or fire fighter examinations contained a statement informing the applicant that he was eligible to apply to a city maintaining a resident eligible list "only if he were a resident of that Town both at the closing date for the Civil Service examination and on the date of actual appointment." *N.A.A.C.P.*, 749 F.Supp. at 1331. The record indicates that no one other than a Harrison resident has ever been considered for a uniformed position. *Id.*

Given the residential hiring policy in effect in Harrison's municipal sector and the fact that the Town population is no more than .2% black, no uniformed or non-uniformed municipal position has ever been held by a black. Black representation among Harrison's private employers, in contrast, totaled 22.1% in 1988, the last year for which figures are available. *Id.*

The plaintiffs in this matter, the Newark branch of the membership organization known as the National Association for the Advancement of Colored Persons ("NAACP"), in furtherance of its interest in securing the civil and equal employment rights of minorities, filed suit against Harrison on July 31, 1989, alleging that the town's enactment of Ordinance 747 and its adherence to the hiring practices embodied in the ordinance violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (1982) because the municipal residency requirement resulted in a disparate impact on blacks.[3] The United States District Court for the District of New Jersey dismissed this complaint for failure to allege standing and denied the plaintiffs' motion to file an amended complaint.

On appeal, we upheld the dismissal of the complaint but concluded that the plaintiffs should have been permitted to amend the complaint in order to cure the standing deficiency. *Newark Branch, NAACP v.*

---

**3.** The plaintiffs filed six similar actions in the same court against other New Jersey cities whose hiring policies incorporated residency requirements similar to that adopted by Harrison. These cases, which challenge residency requirements imposed by Clifton, Fort Lee, Kearny, West Orange, Milburn, and Bayonne, have not been resolved.

*Town of Harrison,* 907 F.2d 1408 (3d Cir. 1990).

While the appeal in the original action was pending, the plaintiffs filed a second action asserting identical claims and seeking the same remedies. The two actions were consolidated and an amended complaint was filed. This complaint alleged that individual members of the NAACP had sought police, fire fighting, and clerical positions with the Town of Harrison but were rejected for failing to satisfy the applicable residency requirement.

Following a bench trial, the district court concluded that there was "a marked disparity between the pool of qualified black applicants for municipal jobs in Harrison and the actual black representation among Harrison's employees," and that "the disparity [was] caused, at least in substantial part, by Harrison's residency requirements." *N.A.A.C.P.,* 749 F.Supp. at 1337. Relying on statistical evidence presented by the plaintiffs, the court concluded that there were substantial numbers of blacks qualified for municipal employment in Harrison within the area · defined as the relevant labor market. "From the perspective of access Harrison could be considered a part of Newark or Essex County.... There are multiple means to travel quickly between most of Essex County and Harrison." *Id.* at 1341. The district court also found "strong evidence that, if the residency requirements were removed, qualified black persons would seek positions with Harrison's municipal government." *Id.* Thus, the district court concluded that the plaintiffs had established a *prima facie* case of disparate impact within the meaning of Title VII. The court also concluded that Harrison had not produced evidence of a business justification sufficiently substantial to overcome the effect of that disparate impact.

After a hearing on remedies, the district court entered a decree enjoining enforcement of Ordinance 747 and obligating the Town of Harrison to recruit and employ qualified black applicants in numbers reflecting their availability in the relevant labor market. Harrison was also enjoined from filling municipal vacancies for uniformed employees from those eligibility lists compiled while the ordinance was in effect. The decree mandated readvertising, retesting and compilation of a new eligibility list from which applicants for police and fire fighting positions would be selected.

It is from this decree that the Town of Harrison appeals, raising three principal claims of error. First, Harrison contends that the district court's restrictive definition of the relevant labor market produced an inaccurate conclusion with respect to disparate impact. Next, Harrison argues that the district court erred in concluding that the Town had presented no legitimate business justification for the challenged ordinance. Finally, Harrison asks that we review the terms of the decree entered by the district court. In Harrison's view, the district court's imposition of affirmative recruitment and hiring obligations was not narrowly tailored to redress any discriminatory effect of the ordinance. Harrison is joined in its attack on the decree by seven town residents as *amicus curiae,* who allege that the district court's invalidation of the then current list of eligibles deprived them of due process and equal protection of the law. We will consider each of these assignments of error in turn.

## II.

### A.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) provides that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely af-

fect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Title VII has been construed to prohibit "not only overt discrimination but also practices that are fair in form but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The "disparate impact" theory of liability, upon which this case turns, has as its basis the premise that "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988).

■ In order to establish a *prima facie* case of disparate impact discrimination, a plaintiff is required to demonstrate that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). "The evidence in these 'disparate impact' cases usually focuses on statistical disparities...." *Watson*, 487 U.S. at 987, 108 S.Ct. at 2784. A comparison between the racial composition of those qualified persons in the relevant labor market and that of those in the jobs at issue typically "forms the proper basis for the initial inquiry in a disparate impact case." *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

■ Once the plaintiffs have succeeded in establishing a *prima facie* case of disparate impact, the focus shifts to a business justification for continued use of the challenged practice which the employer may offer. The employer bears the burden of production with respect to "whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2125. Of course, the burden of persuasion with respect to business justification remains with the plaintiffs. *Id.* Should the plaintiffs be unable to discredit the legitimate business justifi-

cation asserted, they may, nonetheless, prevail, where they are able to suggest a viable alternative to the challenged practice which has the effect of reducing the disparate impact *and* the employer refuses to adopt the alternative. *Wards Cove*, 490 U.S. at 660–661, 109 S.Ct. at 2126–2127.

### B.

On appeal, Harrison challenges two interrelated elements of the district court's disparate impact analysis: the court's definition of the relevant labor market and its rejection of the business justifications offered to support Harrison's adherence to a residency requirement. Each of these assignments of error centers on the district court's alleged failure to accord proper weight to the New Jersey state statutory scheme which authorizes municipalities to make residency a prerequisite to municipal employment.

In order to assess these arguments it is necessary to examine the statute in some detail. As we have noted, in 1978, the New Jersey legislature passed the Act Concerning Residence Requirements for Municipal and County Employees, N.J.S.A. 40A:9–1.1 *et seq.* This Act contains the following provisions:

40A:9–1.3 Bona fide residents of local unit; offices and employees; resolution or ordinance.

Unless otherwise provided by law, the governing body of any local unit may by resolution or ordinance ... require, subject to the provisions of this act, all officers and employees employed by the local unit after the effective date of this act to be bona fide residents therein....

40A:9–1.4 Eligibility of applicants in local units subject to civil service.

Any local unit having adopted the provisions of Title 11 (Civil Service) ... which has also adopted the provisions of section 1 of this act ... may therein limit the eligibility of applicants for positions and employments in the classified service of such local unit to residents of that local unit. Upon receipt of a copy of such ordinance or resolution ... the Civil Ser-

vice Commission thereafter shall not open such local unit's eligibility lists to anyone who is not a bona fide resident of the local unit at the time of the closing date following the announcement of examination....

40A:9–1.5 Non resident appointees to become bona fide residents; failure to maintain; grounds for removal or discharge.

The governing body of a local unit which has adopted a resolution or ordinance ... shall require therein that all nonresidents subsequently appointed to positions or employments shall become bona fide residents of the local unit within 1 year of their appointment....

\* \* \* \* \* \*

[F]ailure of any such employee to maintain residency in a local unit shall be cause for removal or discharge from service....

The Act also provides that residents may receive preference in promotion, N.J.S.A. 40A:9–1.8. A municipality's residency requirement may be waived in the event that insufficient qualified residents apply for available positions, or where the requirements of a particular job demand that a worker possess talents and skills not found in any resident, N.J.S.A. 40A:9–1.6 and 40A:9–1.7. Finally, Section 40A:9–1.10 provides that:

Any requirements concerning eligibility, appointment or promotion contained in any ordinance or resolution adopted pursuant to this act shall be subject to any order issued by any court, or by any State or Federal agency pursuant to law, with respect to a requirement of action to eliminate discrimination in employment based upon race, creed, color, national origin, ancestry, marital status or sex....

Harrison states that although the statute is permissive rather than mandatory, "the option of whether to impose the [residence] requirement ... has been exercised by a majority of New Jersey municipalities."

Thus the Town contends that this nearly-uniform imposition of municipal residency requirements amounts "to, what is in effect, a [constitutionally sound] statewide policy." [4] Harrison further contends that failure to recognize the state-wide adoption of this legislative policy led the district court to err in defining the relevant labor market for purposes of determining whether the plaintiffs had established a *prima facie* case of disparate impact.

### C.

The district court summarized its conclusions with respect to the relevant labor market as follows:

The geographical areas from which Harrison draws employees includes its own County of Hudson as well as Bergen, Essex and Union Counties. These four counties have a total civilian labor force of 1,353,555 of which 214,747 are blacks. By reason of the geographical location and the flow of transportation facilities, Harrison could reasonably be viewed as functionally a component of the City of Newark and a part of Essex County. Newark's population is approximately 60% black. Essex County's civilian labor force totals 391,612 of which 130,397 (or 33.3%) are black. It would be hard to conclude that among the very substantial number of black workers in the four county labor market there are not large numbers of persons qualified to serve as police officers, fire fighters, clerk typists and laborers.

\* \* \* \* \* \*

[H]ere, where Harrison across the board has no black employees and where the total work force in its immediate labor market contains at least 214,747 black persons, disparity is at least suggested.

*N.A.A.C.P.*, 749 F.Supp. at 1338.

The court found additional evidence demonstrating the availability of qualified black employees in statistics showing that 22.1% of Harrison's private labor force is

---

**4.** New Jersey Supreme Court has previously concluded that a rational basis supports the legislature's endorsement of municipal residency requirements. *See, e.g., Abrahams v. Civil Service Commission,* 65 N.J. 61, 319 A.2d 483 (1974).

black.[5] "[M]ost of these persons must have commuted from elsewhere in the labor market which serves Harrison. This body of black employees includes within it a wide range of employment skills." *Id.* From all of the data presented, the district court concluded that in the "vast black labor force in Harrison's labor market, there would be a large number of black persons qualified to serve and wishing to serve" in each category of municipal employment in Harrison. *Id.* "[W]here black persons represent 0% of Harrison's workforce, it matters little whether there is a disparity of 30%, 20% or even 10% or 15%.... [E]vidence in the case overwhelmingly establishes the existence of [a substantial] disparity. Thus, plaintiffs have established the first prong of a *prima facie* case." *Id.* at 1340.

■ In challenging the district court's finding of disparate impact, Harrison does not attack the accuracy of the plaintiffs' statistical analysis. The Town argues instead that the state statutory scheme which authorizes the Harrison Ordinance and others like it necessitates expanding the definition of the "relevant labor market" to encompass the entire State of New Jersey. In its brief Harrison contends that:

> The near uniform application of the [residency] requirement on a statewide level, as well as its uniform application in plaintiffs' conceived "relevant labor markets," thus creates a self-contained refutation of any inference of racial discrimination, since by definition it cuts evenly across racial lines.

> \*       \*       \*       \*       \*       \*

> [V]iewed in the aggregate, the general application of residency requirements can be seen as advancing Title VII objectives by maximizing equality of employment opportunities for minorities through the creation of a qualification for municipal employment which every citizen possesses, regardless of race,

namely bona fide residency within a single municipality.

> [In] focusing on the fact that significant numbers of the black population were denied opportunities to apply for the limited number of municipal employment positions in Harrison, the District Court lost sight of the fact that these populations would enjoy sufficiently enhanced opportunities to obtain similar positions in the significantly larger municipal work forces of their own towns.

Harrison cites no legal precedent for its theory of a state-wide multi-employer labor market. Title VII itself clearly makes each employer responsible for its own employment practices, *see* Sec. 703(a)(2), 42 U.S.C. § 2000e–2(a)(2), and does not support the proposition that one employer is free to discriminate against a class of employees as long as other employers are willing to hire them. The caselaw is no more helpful to the Town. Nothing in *Wards Cove* or other cases interpreting Title VII so much as suggests that available "outside" job opportunities have any relevance whatever to the Title VII liability of a particular employer. Limited authority supports the contrary view.

The Supreme Court has consistently rejected employers' arguments that the disparate impact of a particular employment practice may be nullified where the overall employment picture suggests that no discrimination has taken place. *See Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). In *Teal*, the plaintiffs challenged Connecticut's requirement that welfare supervisors pass a written examination in order to be promoted. The evidence established that while more blacks than whites failed the test, black employees, in fact, were promoted in greater numbers than white employees. The Court held that in spite of the employer's reliance on the "bottom line," it was appropriate to focus on the disparate impact caused by the challenged testing requirement. The

---

**5.** This figure represents only employees of businesses employing at least 100 or more persons. These establishments are required to file EEO–1 reports which supplied the data from which the 22.1% figure was derived.

teaching of *Teal* is that disparate impact analysis will be used

> to measure the effect of *each component* of a selection system, even though the impact of the overall system is not racially disproportionate. Thus, an employer cannot defend a showing of adverse impact by claiming the employment process as a whole does not operate in a discriminatory manner; a racially balanced "bottom line" will not suffice.

Comment, *When Doctrines Collide: Disparate Treatment, Disparate Impact and Watson v. Ft. Worth Bank & Trust*, 137 U.Pa.L.Rev. 1755, 1760 (May, 1989) (footnote omitted) (emphasis added).

The Court confirmed its rejection of the "bottom line" approach to Title VII in *Wards Cove:*

> Our disparate-impact cases have always focused on the impact of *particular* hiring practices on employment opportunities for minorities. Just as an employer cannot escape liability under Title VII by demonstrating that, "at the bottom line," his work force is racially balanced (where particular hiring practices may operate to deprive minorities of employment opportunities) a Title VII plaintiff does not make out a case of disparate impact simply by showing that, "at the bottom line," there is racial *imbalance* in the workforce.

490 U.S. at 656–657, 109 S.Ct. at 2124–2125 (citation omitted) (emphasis in original).

Given that the focus of Title VII does not extend beyond a specific employment practice to the overall picture of the operations of a single employer, we find no merit in the argument that we should evaluate Harrison's hiring practices only in the context of other municipal employers state-wide. The practices of other employers, even when they are undertaken pursuant to a permissive state statutory scheme, are simply irrelevant. This is especially so where the record is devoid of specific evidence detailing the hiring practices of other municipalities and the racial impact of those practices. We believe that the district court's definition of a four-county relevant labor market was reasonable, well-supported and in no way inconsistent with the holding of *Wards Cove.*

Having concluded that residency requirements imposed by other municipalities pursuant to the New Jersey statute were appropriately excluded from the district court's definition of the relevant labor market, we turn to Harrison's argument that the New Jersey statutory scheme was not accorded proper weight in the district court's evaluation of the business justifications proffered by Harrison in support of the ordinance.

### D.

The beginning point of any business justification inquiry must be the Supreme Court's language in *Wards Cove Packing v. Atonio:*

> Though we have phrased the query differently in different cases, it is generally well established that at the justification stage of such a disparate-impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer. The touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice. A mere insubstantial justification in this regard will not suffice ... At the same time, though, there is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster.

490 U.S. at 659, 109 S.Ct. at 2126 (citations omitted).

Harrison argues that, under the *Wards Cove* standard, its burden of production with respect to business justification is satisfied once it demonstrates that a rational purpose underlay its adoption of Ordinance 747. In order to establish this rational purpose, Harrison points to the 1978 Act Concerning Residence Requirement for Municipal and County Employees. As we have noted, Harrison contends that municipal residency requirements imposed pursuant to the Act's grant of permissive authority amount to "a state wide policy" which has withstood constitutional attack in a

number of instances on the ground that the legislature conceivably could have had a rational basis for granting municipalities the authority to impose residency requirements. These possible rational bases are articulated in *Abrahams v. Civil Service Commission*, 65 N.J. 61, 319 A.2d 483 (1974).

In *Abrahams*, the New Jersey Supreme Court considered a federal constitutional challenge to the state legislature's permissive approach to local residency requirements and to the Newark requirement in particular, based upon the "right to travel." Advocates of the constitutionality of local residency requirements cited a number of legitimate governmental purposes conceivably served by such requirements. These included the promotion of ethnic balance in the community, enhancement of the quality of employee performance due to greater knowledge of city conditions and greater personal stake in the city's progress; reduction in absenteeism and tardiness, availability of trained manpower in emergency situations; and the general economic benefits flowing from local expenditure of employees' salaries. 319 A.2d at 489. Evaluating these interests, the Court wrote:

> [In] short, there are one or more substantial rational justifications for the policy of such an ordinance sufficient to outweigh such adverse impact as it may have upon aspirants to municipal employment or those already in the municipal employ.
>
> \*    \*    \*    \*    \*    \*
>
> [The] statutory local option in the case of employees ... vests the policy choice in the municipal legislature.... Some municipalities ... have deemed it consonant with local policy to exercise the option. We hold they may validly do so free of any constitutional interdiction.

*Id.* (footnote omitted).

That legitimate governmental interests may be served by municipal residency ordinances has also been recognized in the context of other constitutional challenges. *See Kennedy v. City of Newark*, 29 N.J. 178, 148 A.2d 473, 476 (1959) ("If there is a rational basis for a residence requirement in furtherance of the public welfare, the constitutional issue [raised based on Art. I, par. 1 of the New Jersey Constitution] must be resolved in favor of the legislative power to ordain it."); *Trainor v. City of Newark*, 145 N.J.Super. 466, 368 A.2d 381 (App.Div.1976) (Newark ordinance upheld despite fourteenth amendment equal protection challenge); *Mercadante v. City of Paterson*, 111 N.J.Super. 35, 266 A.2d 611 (Ch.Div.1970) (reiterating that residential requirements have been found to be constitutional).

The Town of Harrison contends that the New Jersey statute and the policy underlying it differentiate this case from all other Title VII cases in that the statute and its policy automatically satisfy Harrison's burden of production with respect to business justification under the standards announced by the Supreme Court in *Wards Cove*. According to Harrison:

> [P]roper inquiry into the legitimacy or substantiality of Harrison's objectives should have ... directly focused upon the intent of the New Jersey state legislature in enacting N.J.S.A. 40A:9–1.3.... [The] residency requirement should have been examined by the District Court with a view toward determining whether a rational purpose [underlay] its adoption. Such a finding alone would have satisfied Harrison's obligation to *produce* evidence of a "business justification."

(Emphasis in original.)

Arguing that it met its burden of production under *Wards Cove*, Harrison contends that the district court erred in holding its proffered business justification "insubstantial" without requiring the plaintiffs to prove that the justification submitted was pretextual. Harrison argues that in failing to shift the burden of proof back to the plaintiffs, the district court violated the teaching of *Wards Cove* and, in effect, required the Town to prove that its residency ordinance was compelled by business necessity.

We believe that Harrison's argument rests on a misperception of the defendant's burden under *Wards Cove*. As we have

recognized, the Supreme Court held in *Wards Cove* that once the plaintiffs have succeeded in establishing a prima facie case of disparate impact with respect to a challenged employment practice, the employer is required to produce evidence of a business justification supporting the employment practice. Although *Wards Cove* arguably diluted the business necessity burden imposed upon the defendant under prior case law, *e.g., Duke Power Co. v. Griggs*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), it did not reduce the defendant's burden to a showing of mere rationality. While it is now clear that the employer need not show that a challenged practice is absolutely necessary, it *must* demonstrate that the practice furthers legitimate business goals "in a significant way." *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2125. Courts evaluating business justifications are required to subject those justifications to a "reasoned review" rather than simply defer to them. *See* Note, *English Only Rules and "Innocent" Employers: Clarifying National Origin Discrimination and Disparate Impact Theory under Title VII*, 74 Minn.L.Rev. 387, 419 (1989).

The quantum and quality of evidence which a defendant must produce in order to satisfy the burden of production outlined in *Wards Cove* is not well-articulated in the caselaw. Where, as here, the district court seems to have rejected the proffered justification as a matter of law, we must meet the issue of the defendant's burden head-on. We must decide whether, as Harrison argues, it is sufficient for purposes of its burden of production that the Town has articulated an admittedly rational basis for adhering to the residents-only ordinance or whether something more is required.

The district court concluded, and we agree, that under *Wards Cove* the defendant's burden of production involves something beyond mere articulation of a rational basis for the challenged practice. The Court's language in *Wards Cove* clearly indicates that more is required. Caselaw which follows *Wards Cove* and addresses the weight of the defendant's burden supports this view. *See Nash v. Consolidated*

*City of Jacksonville*, 905 F.2d 355, 358 (11th Cir.1990) (City failed to meet burden of producing evidence that exam was job-related and served the asserted business justification of promoting most qualified fire fighters); *Green v. U.S.X.*, 896 F.2d 801, 805 (3d Cir.1990) (*Wards Cove* does not require court to accept at face value an employer's explanation of the adverse impact of its hiring practices on blacks); *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1328–29 at n. 24 (5th Cir.1991) (under disparate impact theory, employer must show more than some nondiscriminatory reason for policy; employer must show that policy is significantly related to legitimate business purpose such as successful job performance); *Ray v. Frank*, 1990 WL 304064, 1990 U.S.Dist. Lexis 9878 (W.D.Mo. 1990) (employer must present "sufficient" evidence that the practice serves a legitimate employment objective); *Davis v. City of Dallas*, 748 F.Supp. 1165, 1171 (N.D.Tex. 1990) (defendant bears the burden of producing a clear, reasonably specific legitimate non-discriminatory reason for each of its challenged hiring decisions).

While *Wards Cove* did effect significant changes with respect to Title VII, commentators have suggested that any change with respect to business necessity is less significant than might appear at first blush. "Even though the Court reallocated the burden of persuasion and diluted the employer's business necessity burden, it still requires the employer to show more than a legitimate business purpose. The employer must prove that the practice furthers business goals in a 'significant way'." *English Only Rules, supra*, at 419. "*Wards Cove* . . . did not overrule or even criticize the numerous applications by the Court of the business necessity doctrine. This suggests that the Court's restatement of 'business necessity,' while using different words that fall short of any dictionary definition of 'necessity,' nonetheless does not in fact create a significantly lighter standard than had been generally adopted prior to *Wards Cove*. . . ." Player, *Is Griggs Dead? Reflecting (Fearfully) on*

*Wards Cove Packing Co. v. Atonio,* 17 Fla.St.L.Rev. 1 (1989).

While we agree that after *Wards Cove* the business necessity defense might, as the Court of Appeals for the Seventh Circuit suggests, better be termed the "issue of legitimate employer purpose," *Allen v. Seidman,* 881 F.2d 375, 381 (7th Cir.1989), *Wards Cove* clearly places the burden on the employer to produce evidence that "the challenged practice serves, in a significant way, the employment goals of the defendant." *Wards Cove,* 490 U.S. at 659, 109 S.Ct. at 2125. This language confirms that the employer retains the burden of producing significant evidence that establishes a strong factual showing of manifest relationship between the challenged practice and the defendant's employment goals.

That burden, in our view, is met only when the employer is able to adduce

> some proof that the device serves identified legitimate and substantive business goals. That is, the defendant's burden [is] to identify the particular employment goal and to present evidence of how the [challenged practice] "serves in a significant way" the identified goal. Merely being abstractly rational, as opposed to arbitrary, would not suffice. The defendant, therefore, has some burden of presenting objective evidence ... factually showing a nexus between the selection device and a particular employment goal. Without evidence of such a relationship it cannot be said that the defendant has presented any evidence that the "challenged practice serves, in a significant way, the legitimate employment goals of the employer."

Player, *supra,* 17 Fla.St.L.Rev. at 32.

### E.

▮ With the parameters of the employer's burden defined, we turn to the business justifications offered by Harrison. Harrison argues that its articulation of the rational bases underlying the state statutory scheme permitting municipal residency restrictions is sufficient to satisfy its burden of production for purposes of Title VII. We cannot agree.

Where discrimination effected by state law or municipal ordinance will survive constitutional challenge "[i]f any state of facts reasonably may be conceived to justify it," *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), the standard applicable to employment practices under Title VII is more demanding. If an employment practice is shown to have a discriminatory impact, an employer is required to show more than facts which "reasonably may be conceived." Instead, the employer is required to produce evidence that the practice "serves, in a significant way the legitimate employment related goals of the employer." *Wards Cove,* 490 U.S. at 642, 109 S.Ct. at 2117.

While we do not dispute that there are conceivable rational bases which can be articulated to support both the New Jersey state statute and the Harrison municipal ordinance, we conclude that the mere assertion of these conceivable bases is not sufficient to satisfy Harrison's burden of production with respect to business justification. Under the terms of the test which we have articulated, Harrison was required to present objective evidence demonstrating a nexus between its residency ordinance and a particular employment goal. This it did not do.

The district court discussed each of the rational bases advanced by Harrison as supporting its claim of business justification for Ordinance 747. In the case of uniformed personnel, Harrison claimed that the need for quick response in emergency situations made municipal residency important. Municipal residency also serves to ensure that uniformed officers know the community well and fosters loyalty. Furthermore, opening the eligibility lists to non-residents would increase the number of job applicants, making it expensive and time-consuming for the Town to conduct pre-employment investigations. In the context of non-uniformed employees, Harrison argued that the residency requirement fostered loyalty and reduced tardiness and absenteeism.

While the court recognized that there was, in the case of police officers and fire

fighters, "a good business reason to require residence in or proximity to the community served," there were means, other than imposition of a residency requirement, to ensure availability of uniformed personnel in the event of an emergency. "A reasonable response time or distance requirement would necessarily include areas adjacent to Harrison and enable the Town to draw on black applicants from those areas." *N.A.A.C.P.*, 749 F.Supp. at 1342. The court also noted that while there *would* undoubtedly be an increase in the number of applicants for uniformed positions, any incremental expense required to conduct pre-employment investigation would be offset by the greater choice of better-qualified applicants and could be limited by imposition of a distance as opposed to a residency requirement. Finally, with respect to Harrison's argument that there are benefits associated with the local presence of off-duty fire and police personnel, the court concluded that while employee participation in local programs was a plus factor, this participation was not "sufficiently substantial to justify the discriminatory effect of the residency requirement." *Id.*

The business justifications offered in support of imposing a residency requirement upon non-uniformed personnel were found to be similarly deficient. These justifications centered on loyalty-related advantages alleged to flow from Harrison's residency requirement and were supported by the testimony of Harrison officials. These officials testified to a belief that local workers were more likely to be loyal in the performance of their work and less likely to be tardy or absent. They also expressed the belief that local workers, even when off duty, would associate with those whom they serve and would become involved in community-related projects. The district court concluded that "[t]hese so-called 'business reasons' are too nebulous and insubstantial to justify practices which have had a significant discriminatory effect which have prevented the Town from ever employing a black person." *Id.*

Our review of the record in this matter convinces us that the district court correctly applied the business justification analysis mandated by *Ward's Cove* and properly concluded that the justifications proffered were "insubstantial." The Town of Harrison presented no objective evidence demonstrating a nexus between its residency ordinance and any specific employment goal. As a result, it cannot be said that Harrison presented *any* evidence that its residency requirement "serves, in a significant way, the legitimate employment goals of the employer" within the meaning of *Wards Cove.* The district court was correct, therefore, in concluding that Harrison did not satisfy its burden of production with respect to business justification.

### III.

Having found no error in the district court's disparate impact analysis, we turn to the issue of remedy. "In order to end defendant's discriminatory practices and to remedy the effects of past discrimination," the district court framed a decree which requires that the Town of Harrison "cease to follow or enforce Ordinance 747 with respect to recruitment and hiring [of] municipal employees" and provides that municipal residency may no longer be made a factor in the "recruiting, selection, tenure or promotion of any employees." (Decree, pp. 1–2). Word of mouth recruitment and recruitment efforts directed solely to town residents are prohibited.

Those provisions of the decree addressing uniformed positions permit Harrison to require that police officers and fire fighters reside, within a reasonable time after appointment, within a fifteen mile radius of Harrison and to accord preference in hiring to residents of Essex and Hudson counties. *Id.* Municipal vacancies may no longer be filled from eligibility lists incorporating a residential preference; readvertising and retesting by the New Jersey Department of Personnel are mandated. *Id.* at 3.

With regard to all municipal positions, the decree provides that

> Harrison shall in good faith seek to recruit and employ qualified black applicants in numbers reflecting their avail-

ability in the relevant labor market. To achieve that objective, Harrison shall adopt and implement affirmative recruitment activities directed towards potential black applicants in addition to recruitment directed at other potential applicants and shall use fair and non-discriminatory hiring and other employment procedures.

(*Id.* at 4). These affirmative activities include paid radio station advertising and public service announcements on radio stations "having a large black audience" and have as their goal "the recruitment of black applicants for each position or examination in numbers reflecting their availability in the job category being filled." *Id.* at 5.

The decree also incorporates detailed record-keeping and reporting requirements and sets the termination date of the decree at five years following its entry provided that the defendants are able to show substantial compliance with and fulfillment of the purposes of the decree.

The Town of Harrison challenges the terms of the decree, arguing that any relief granted "should be limited to removal of the residency requirement since this is not a case where an employer adopted a policy of intentional discrimination that would warrant the sweeping affirmative measures contained in the decree." In Harrison's view, those provisions of the decree which embody the objective that minority municipal employment in Harrison rise to percentage levels equal to those in the relevant labor market, are inconsistent with the Supreme Court's pronouncement regarding Title VII in *Wards Cove* and violate equal protection guarantees.

In support of its contentions based upon Title VII, Harrison relies exclusively upon the *Wards Cove* directive that in order to establish a *prima facie* case, statistical comparisons must, as closely as possible, identify the adverse effect of a specific employment practice on particular minority persons. 490 U.S. at 656, 109 S.Ct. at 2124. From this directive, Harrison concludes that remedies must be narrowly tailored to eliminate only those discriminatory practices actually proven. In the Town's view, then, the remedy in this case can legitimately extend no further than invalidation of the residency ordinance. It argues that the district court's requirement that the percentage of minority municipal employment in Harrison be raised to a level approximating the percentage of minority employment in the relevant labor market as a whole, holds the Town "responsible for the definite goals contained in the decree, which may not be achievable absent changes in societal patterns for which Harrison is not responsible."

We find no merit to this argument. We have held that the district court properly defined the relevant labor market and correctly concluded that there was a marked disparity between minority employment in that market and in Harrison's municipal sector. We cannot, therefore, say that the district court erred in formulating a decree designed to eliminate that disparity through affirmative recruitment efforts. The remedy fashioned flows logically from the Title VII violation established and in no way transgresses the remedial authority conferred upon the courts under Title VII.

"[T]he scope of a district court's remedial powers under Title VII is determined by the purposes of the Act." *Teamsters v. United States*, 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1976). Title VII has as its goal "to make persons whole for injuries suffered on account of unlawful employment discrimination. This is shown by the fact that Congress took care to arm the courts with full equitable powers." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

The Supreme Court has held repeatedly that the purpose of Congress in vesting broad equitable powers in Title VII courts was "to make possible the 'fashion[ing] [of] the most complete relief possible,'" and that the district courts have "'not merely the power but the duty to render a decree which so far as possible eliminates the discriminatory effects of the past as well as bar discrimination in

the future.'" *Albemarle,* [422 U.S.] at 421, 418 [95 S.Ct. at 2373, 2372]. *Teamsters v. United States,* 431 U.S. at 364–65, 97 S.Ct. at 1869–70.

Harrison also contends that the decree provision relating to affirmative recruitment measures "runs afoul of recent Supreme Court equal protection doctrine condemning the governmental institution of 'affirmative action' programs." This argument, too, is without merit. The Supreme Court has unequivocally upheld the authority of a district court to "[order] affirmative action in appropriate circumstances as a remedy for past discrimination." *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 464–65, 106 S.Ct. 3019, 3043–45, 92 L.Ed.2d 344 (1985).[6] In determining whether affirmative action is warranted, district courts are directed to consider whether such action is necessary to remedy past discrimination, "the efficacy of alternative remedies; flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1986).

When the remedy fashioned by the district court is measured against these standards, we cannot say that it is defective under either Title VII or equal protection principles. Based upon a valid statistical comparison, the district court found a "marked disparity between the pool of qualified black applicants for municipal jobs in Harrison and the actual black representation among Harrison's employees." *N.A.A.C.P.,* 749 F.Supp. at 1337. This disparity was long-standing. "The Town of Harrison has had a policy of hiring residents for its police, fire and non-uniformed positions for as long as the Town's witnesses could remember (which in some instances was a very long time indeed).... [The] municipality has *never* hired a non-resident

or a black." *Id.* at 1329 (emphasis added). The district court also concluded that "experts are [not] needed to establish in the circumstances of this case that the disparity is caused, at least in substantial part, by Harrison's residency requirements." *Id.* at 1337.

In light of the long history and exclusionary effect of "residents only" hiring in Harrison, we believe that the district court's reliance on affirmative recruitment efforts was appropriate in order to "dissipate the lingering effects of pervasive discrimination." *Sheet Metal Workers v. EEOC,* 478 U.S. at 476, 106 S.Ct. at 3050. Duration of the relief was limited by the decree to five years based upon a showing of substantial compliance; provision was made for modification of the terms of the decree upon application to and approval by the district court. We find no ground for believing that the district court's goal that qualified blacks be recruited and employed in numbers reflecting their availability in the labor pool available was designed to achieve and maintain some arbitrary notion of appropriate racial balance. We think it clear from the terms of the decree as a whole that the goal was devised "as a benchmark against which the court could gauge [the Town's] efforts to remedy past discrimination." *Id.* at 478, 106 S.Ct. at 3051.

The facts of this case distinguish it from others cited by Harrison such as *City of Richmond v. J.A. Crosen Company,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and *Krupa v. New Castle County,* 732 F.Supp. 497 (D.Del.1990), where municipal entities adopted affirmative action plans, involving actual quotas, based on statistical comparisons not found to be indicative of past discrimination. Here, as we have noted, the challenged plan was adopted by the district court on the basis of a sound statistical analysis strongly suggestive of long-standing discriminatory impact in hiring. Where there is an adequate

---

**6.** The decree in this case is far more limited than that involved in *Sheet Metal Workers.* No hiring orders or strict quotas have been imposed. The district court chose to rely instead upon advertising and other recruitment measures to redress the disparity noted. This type of decree has been described and implicitly approved as a "cautious approach to the use of racial preferences...." *See Sheet Metal Workers,* 478 U.S. at 476 n. 48, 106 S.Ct. at 3050 n. 48.

finding of past discrimination and the remedy is formulated to address this past discrimination, affirmative recruitment efforts mandated by the district court do *not* violate equal protection guarantees. *See generally United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1986), and *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1985).

### IV.

Having concluded that the decree entered by the district court is sufficiently narrowly drawn to survive the Title VII and equal protection challenges mounted by the Town of Harrison, we turn, finally, to those aspects of the decree challenged in a brief filed as *amicus curiae.* Amici, seven Harrison residents who were tested and appointed to a hiring eligibility list for the position of municipal fire fighter within the Town of Harrison, challenge only that portion of the district court decree which invalidates and enjoins hiring from the fire fighter eligibility list which became effective on September 1, 1989 and was expected to remain in effect until September 6, 1992. These residents who were never made parties to this litigation and apparently never sought to intervene,[7] frame their arguments as though they, too, appeal from the district court order.[8] *Amici* thus seek specific substantive relief stemming from the alleged infringement of their rights under the fourteenth amendment due process and equal protection clauses.

The nature of the arguments raised in the brief for *amicus curiae* requires that we digress briefly in order to address the appropriate role of an *amicus curiae* and our obligations with respect to the issues presented.

*Amicus curiae* is a latin phrase for "friend of the court" as distinguished from an advocate before the court. It serves only for the benefit of the court, assisting the court in cases of general public interest by making suggestions to the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision.

An *amicus curiae* is not a party to the litigation and therefore does not necessarily represent the views or interests of either party. Since an *amicus* does not represent the parties but participates only for the benefit of the court, it is solely within the discretion of the court to determine the fact, extent, and manner of participation by the *amicus.*

*Alexander v. Hall,* 64 F.R.D. 152, 155 (D.S. C.1974) (citations omitted). "[L]acking party status, [an *amicus* ] has no right to review by appeal of any decision affecting its identified substantive interests." *Newport News Shipbuilding and Drydock Co. v. Peninsula Shipbuilder's Association,* 646 F.2d 117, 122 (4th Cir.1981). *See also Berry v. Doles,* 438 U.S. 190, 202, 98 S.Ct. 2692, 2698, 57 L.Ed.2d 693 (1978) (Rehnquist, J., dissenting) (*amicus curiae* has no standing to request relief not requested by the parties); *Moten v. Bricklayers, Masons and Plasterers,* 543 F.2d 224, 227 (D.C.Cir. 1976) (normally *amicus curiae* has no standing to appeal a lower court order); *United States v. Louisiana,* 718 F.Supp. 525, 528 (E.D.La.1989) (court is not bound to afford relief to *amicus* apart from relief appropriate for those who are actual parties); and *Common Cause v. Bolger,* 512 F.Supp. 26, 28 (D.D.C.1980) (dubious assumption that *amicus* has standing to raise argument not pressed by the parties).

While we will not consider the amici's request for substantive individualized relief, we will evaluate the alternative claims of error in order to determine whether there are grounds, not already identified by

---

**7.** There is nothing in the record to suggest that *amici* ever attempted to intervene in this matter. *Amici* have filed suit against the Town of Harrison in the District Court for the District of New Jersey. *See Lang v. Township of Harrison,* No. 90–4357.

**8.** The *amicus* brief contains the following request for relief: "Amicus curiae now seek a reversal of the District Court's decision on the grounds that it is violative of their due process and equal protection rights under the Fourteenth Amendment."

the Town, which would mandate reversal or modification of the district court decree.

▌ The thrust of the *amicus* argument is that by invalidating the then-current fire fighter eligibility list and directing re-testing and compilation of a new list, "[t]he court-imposed Title VII remedy, even if it met the *Wards Cove* standards, trammelled upon the innocent amicus curiae's constitutional right[ ] to ... due process...." *Amici* argue that invalidation of the eligibility list without according those on the list an opportunity to be heard deprived them of a property interest without due process of law.

In order to place this argument in context it is necessary to establish precisely what the district court required with respect to the fire fighter eligibility list. The decree contains the following provisions:

2. Harrison shall immediately cease filling municipal employment vacancies from lists created while a policy and practice of classifying applicants according to their residence and granting a preference in selection and hiring to residents of Harrison was in effect; and shall readvertise and retest or request the New Jersey Department of Personnel to readvertise and retest for any vacancies previously advertised but not yet filled. Any person who met the age requirement for ... fire fighter examination and who took the examination for Harrison, Hudson County or Essex County in 1988 shall be deemed to have satisfied the age requirement for police officer or fire fighter for purposes of the new examinations.

3. Harrison shall immediately advise the New Jersey Department of Personnel of its change in policy with respect to classification of applicants on the basis of residence and shall promptly furnish the Department of Personnel with a copy of this decree, and shall at the same time request that the Department of Personnel create new lists of eligibles for ... fire fighter positions based upon the new policy at the earliest practicable date.

\* \* \* \* \* \*

8. The provisions of this decree are not intended to reduce the qualification standards for employment with Harrison. Nothing in this decree shall obligate ... Harrison to create new positions, to hire unnecessary personnel, to contract or refrain from contracting out work ..., or to hire, transfer or promote any person who is not qualified as measured by valid qualification standards, or who is less qualified than another in the applicant pool, as measured by valid qualification standards.

Decree at 2 and 6. According to the terms of the decree, then, the names of *amici* were not removed from the eligibility list; the entire list was invalidated with those on the invalidated list being given the opportunity to compete for positions on a revised list which would also include residents of Hudson and Essex Counties. The *amici* argue that if they are forced to compete with non-Harrison residents for available fire fighting positions, it is likely that their rank order will fall, reducing their chances of being hired. The *amici* thus claim the right "to be retained in their respective positions on the fire fighter's eligibility list for the Township of Harrison."

In order for *amici* to state a cognizable due process claim based on invalidation of the eligibility list, they must establish a protected property interest in their particular rank on the eligibility list. "To have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim for entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). *See also Unger v. National Residents Matching Program*, 928 F.2d 1392, 1397 (3d Cir. 1991). Legitimate claims of entitlement may be created expressly by state statute or regulation or may arise from government policies or "mutually explicit understanding" between a government employer and employee. *Perry v. Sinderman*, 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972).

*Amici* have not identified any case in which a court has recognized a constitutionally protected property interest in a specific ranking on an eligibility list compiled for purposes of hiring. No such right is recognized by New Jersey statute or in the New Jersey caselaw[9] and we do not find support for such a right in the law of other jurisdictions.

*Amici* argue that a property interest in a specific eligibility ranking is rooted in the fact that the town of Harrison "had established a policy and procedure for the placement of names on this eligibility list and of maintaining these names for a stated period of time." In alleging that this policy was undermined by the district court decree, *amici* attempt to bring this case within the scope of our holding in *Stana v. School District of the City of Pittsburgh*, 775 F.2d 122 (3d Cir.1985).

The plaintiff in *Stana*, a teacher certified by the Pennsylvania Department of Education, applied for a teaching position with the Pittsburgh public school district. Following a series of examinations and interviews, Stana was placed and ranked as one of the top three candidates on a teachers' eligibility list. While the eligibility list was still in force, the Pittsburgh school district received a confidential negative evaluation of Stana's work. As a result of this evaluation, Stana, although technically remaining on the eligibility list, was bypassed for the next available teaching position. The position was advertised and, eventually, a candidate not on the teachers' eligibility list was hired. Stana was subsequently notified that her name had been removed from the eligibility list. Stana did not receive prior notice that her name would be removed from the list and was not accorded the opportunity to be heard with respect to the negative evaluation.

In concluding that Stana had alleged a constitutionally protected interest subject to the rudiments of due process, we concluded that the School District had estab-

lished a "policy for placement and rank on the [teachers' eligibility] list and for maintenance of names on that list for a specified period of time." *Stana*, 775 F.2d at 126.

In this case, Stana's retention on the eligibility list, which was a *sine qua non* for her placement in a teaching position with the Pittsburgh School district, implicated a constitutional "property" interest created by state law. The evidence establishes that Stana had a sufficient "legitimate claim of entitlement" to her place on the eligibility list so that it could not be "arbitrarily undermined", the essence of a property interest. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972).

*Stana*, 775 F.2d at 125 (footnote and portions of citation omitted).

Despite the arguments of *amici* to the contrary, the case now before us is not governed by *Stana*. Here, *amici* have not been denied the opportunity to compete for fire fighter positions in Harrison and no name has been removed from the eligibility list because of an arbitrary decision based on "secret" adverse information. Rather, the district court decree directs that because the eligibility list in question was tainted by illegal discrimination, a new list, which presumably will include the *amici*, must be created.

Far from depriving these fire fighter applicants of the right to be considered for a position, the decree requires only that *amici* and any others similarly situated compete, on the basis of merit, against those candidates who may have been impermissibly excluded from the "original" eligibility list. We see nothing in the record before us to suggest that *any* interest, much less a recognized property interest, of *amici* has been "arbitrarily undermined," by the district court decree.

This conclusion is supported by our decision in *Vulcan Pioneers v. N.J. Dept. of*

---

**9.** New Jersey caselaw establishes only a limited interest arising from placement on an eligibility list. So long as a particular list is in effect, appointments may be made only from that list. *In re Crowley*, 193 N.J.Super. 197, 473 A.2d 90 (1984). A person passed over on the list may also be entitled by statute to a hearing where there are allegations that the action was motivated by discrimination on the basis of race, sex, or union affiliation. *Id.* 473 A.2d at 98.

*Civil Service*, 832 F.2d 811 (3d Cir.1987). There, we upheld a district court order enjoining the use of fire fighter promotion lists generated by suspect testing procedures. Those ranked on the invalidated list intervened in the action arguing that the "relief ordered by the district court punishe[d] and [was] unfair to those candidates who, by virtue of their high ranking on eligibility lists, expected promotions." *Id.* at 816. We rejected this argument, stating that

> Candidates who scored well on an invalid exam do not have an "absolute right" to or even a "legitimately firmly rooted expectation" of the promotion. Furthermore, candidates not promoted ... remain eligible to compete for these very same promotions when the new examination is administered. Any burdens placed on these candidates simply do not rise to an impermissible level.

*Vulcan Pioneers*, 832 F.2d at 816–817 (citation and footnote omitted). We believe that the same thing can be said here. Candidates who rank well on an eligibility list formulated as the result of discriminatory practices do not have an absolute right to retain or even a legitimate expectation of retaining that rank when the effect of those discriminatory practices is eliminated.

We find additional support in cases decided by the Court of Appeals for the Seventh Circuit. In *Petru v. City of Berwyn*, 872 F.2d 1359 (7th Cir.1979) a prospective fire fighter filed an action under 42 U.S.C. § 1983 alleging that the City of Berwyn violated his right to due process in failing to appoint him to the position of fire fighter. A consent decree made between the City and the Justice Department enjoined the City from using the eligibility list on which the plaintiff's name appeared on the ground that the list had been based upon voter and residency requirements that were eliminated by the decree. *Petru*, 872 F.2d at 1360. The list upon which Petru's name had appeared expired without his having been granted a position.

Finding that Petru had failed to allege a property interest sufficient to invoke the due process clause, the court wrote:

> To recognize a "property" interest for an appointment to a classified position in the realm of public employment would drastically extend the scope of the due process clause and we refuse to make that extension.

*Id.* at 1363. The court then emphasized the position which it had taken previously in *United States v. City of Chicago*, 869 F.2d 1033, 1038 (7th Cir.1989):

> [T]he message ... under Illinois law is clear: a roster ranking may create an expectation of promotion, but an officer has no entitlement to a particular roster position or to promotion.

*Id.* We find no ground for believing that the conclusion would be different under New Jersey law. While *amici* contend that Harrison had established a policy and procedure for placing names on this eligibility list and maintaining the list for a stated period of time, New Jersey law clearly vests responsibility for the establishment, cancellation, and duration of eligibility lists in the State Department of Personnel.

N.J.S.A. 11A:4–4 states:

The commissioner [of Personnel] shall provide for:

a. The establishment and cancellation of eligibility lists;

b. The certification of an eligible list to positions in other appropriate titles; and

c. The consolidation of eligible lists which may include, but is not limited to, the combining of names of eligibles by scores.

N.J.S.A. 11A:4–6 further provides that "The Commissioner shall set the duration of an eligible list...." State regulations governing eligibility lists, N.J.A.C. 4A:4–3.1 *et seq.*, confirm the Commissioner's authority with respect to eligibility lists. Section 4A:4–3.3(6) specifically provides that:

> The Commissioner may, in case of fraud, illegality, test invalidity, error by the Department or other good cause, cancel an eligible list prior to its expiration date by issuing a public notice and entering such notice in the minutes of the Merit Board System.

These statutory and administrative provisions undermine *amici*'s claim to a protected property interest in continuation of a specific eligibility list or in a particular position on that list.

We have given careful attention to each of the due process arguments advanced by *amici*, and we are thus satisfied that the district court's invalidation of the eligibility list did not impinge upon the recognized property interests of innocent parties and thus does not implicate due process concerns.

Finally, *amici* also contend that the removal of "names from the eligibility list for the Town of Harrison because of their race resulted in a violation of the Equal Protection Clause." This argument is a variant, in a narrower context, of the equal protection argument raised on appeal by the Town of Harrison. *Amici* argue that invalidation of the fire fighter eligibility list involves a "racial and ethnic distinction[ ] [which is] inherently suspect and call[s] for the most exacting judicial examination." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986), citing *University of California Regents v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (opinion of Powell, J., joined by White, J.). We cannot agree that the decree provision at issue draws any racial or ethnic distinction or that it imposes or induces any preference in hiring. This provision was designed to provide for rank-order hiring from a list of eligibles drawn from the relevant labor market with no preference granted on the basis of race. Competition based upon merit is not compromised.

## V.

Having examined each of the issues raised, we conclude that the district court based its finding of disparate impact upon data drawn from a logically defined relevant labor market, correctly applied the law with respect to business justification, and formulated an appropriate remedy to address the discriminatory effect of the residency ordinance. We will, therefore, affirm the order of the district court.