PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2442
_____

GREGORY MEDITZ,
                                        Appellant
                    v.

CITY OF NEWARK;
DOES 1-10
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR
THE DISTRICT OF NEW JERSEY
(D.C. Civ. Action No. 08-cv-2912)
District Judge: Honorable William J. Martini
_____

Argued April 27, 2011
_____

Before: SLOVITER, GREENAWAY, JR., and ROTH,
Circuit Judges

(Opinion Filed: September 28, 2011 )

1

Gregory Meditz (argued)
89 Uhland Street
East Rutherford, NJ 07073
          *Appellant, pro se*

Gary S. Lipshutz, Esquire
Emelia Perez, Esquire (argued)
City of Newark, Department of Law
920 Broad Street
Newark, NJ 07102
          *Counsel for Appellee City of Newark*

_____

OPINION

_____

GREENAWAY, JR., Circuit Judge

          Gregory Meditz ("Meditz"), an attorney proceeding pro se, appeals from the District Court's grant of summary judgment in favor of the City of Newark ("Newark") on his claim of disparate impact and his motion to strike[1] an exhibit

_____

          [1] Before the District Court, Meditz sought to strike a certification attached to Newark's reply brief. The District Court denied this motion, concluding that the information contained in the certification was publicly available, that Meditz was aware of the information, and that the "contents are unnecessary to decide the present summary judgment motion, and have in no way altered this Court's decision." (App. 4.) We review the District Court's decision denying

attached to Newark's reply brief. Meditz alleges that the residency requirement adopted by Newark for its non-uniformed work force has a disparate impact on white, non-Hispanics because Newark's population does not reflect the racial make-up of the relevant labor market in the surrounding area. As a result, white, non-Hispanics are under-represented in Newark's non-uniformed work force. For the reasons set forth below, we conclude that the grant of summary judgment on the disparate impact claim was not appropriate based on this record. We will therefore reverse and remand for further proceedings consistent with this opinion.

## I.    Facts/background

In April 2007, Meditz, a white male, applied for the position of Housing Development Analyst in Newark. He was rejected in July 2007 because, at the time, he lived in Rutherford, New Jersey.[2]  Newark has a residency

---

the motion to strike for an abuse of discretion. See In re: Fine Paper Antitrust Litig., 751 F.2d 603, 604 (3d Cir. 1984). "A district court abuses its discretion if its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Johnston v. HBO Film Management, Inc., 265 F.3d 178, 183 (3d Cir. 2001). We conclude that the District Court did not abuse its discretion in denying the motion to strike since we find no clearly erroneous finding of fact, errant conclusion of law, or improper application of law to fact.

[2] Meditz now lives in East Rutherford, New Jersey.

requirement for non-uniformed employees.[3]  In light of the

---

[3]  Newark's ordinance setting forth its residency requirements provides that:

> All officers and employees of the City who shall hereafter become employees of the City are hereby required as a condition of their continued employment to have their place of abode in the City and to be bona fide residents therein, except as otherwise provided by the Charter.  A bona fide resident, for the purpose of this section, is a person having a permanent domicile within the City and one which has not been adopted with the intention of again taking up or claiming a previous residence acquired outside of the City limits.

> The Director of any Department or the Mayor or City Clerk is hereby authorized in his/her discretion, for good cause shown, to permit any officer or employee of the City in his/her respective department or office to remain in the employ of the City without complying with the provisions hereof, where:

> a.  The health of any officer or employee necessitated residence outside of the City limits;

> b.  The nature of the employment is such as to require residence outside of the City limits;

waiver provisions in the ordinance, 185 non-uniformed employees[4] reside outside of Newark, in 82[5] different municipalities, including some in other states. Uniformed employees must reside in Newark during their preliminary training, but then can move out of the city.

In support of his prima facie case, Meditz provided detailed statistical information in opposition to Newark's motion for summary judgment. Meditz obtained the

---

> c. Special talent or technique which is necessary for the operation of government not found among Newark residents exists justifying residence outside of the City limits;

> Failure of any officer or employee to comply with this section shall be cause for his/her removal or discharge from the City service.

NEWARK, N.J. REV. ORDINANCES § 2:24-1.1.

[4] Newark has 4,316 employees, of which 1,949 are non-uniformed and 2,367 are uniformed. Currently, 185 non-uniformed employees reside outside the city and 805 uniformed employees reside outside the city.

[5] The parties disagree as to the number of different municipalities in which Newark employees live. This difference is not material to the underlying issues in this case.

statistical information from publicly available reports. Newark does not dispute the validity of any of the statistics Meditz presented. These statistics compared the ethnic distribution of non-uniformed employees to the ethnic make-up of Newark.[6] Meditz argued that the difference between the percentages of white, non-Hispanic non-uniformed and uniformed employees was based on the residency requirement for non-uniformed employees. That is, Meditz posited that the residency requirement for non-uniformed employees was negatively impacting the hiring of white, non-Hispanics.

Newark argues that the statistics presented by Meditz do not support his prima facie case, since "the statistical disparities are not sufficiently substantial as to show that the residency ordinance has caused whites of non-Hispanic origin to be excluded from jobs with [Newark] because of their race." (Br. of Def.-Appellee City of Newark 10.)

Alleging that the relevant labor market was the six county area surrounding Newark, Meditz also provided the ethnic breakdown of the general population in the surrounding counties, all of which included higher percentages of white, non-Hispanics than were employed as non-uniformed employees in Newark.[7] He included more

[6] In 2007, 9.24% of the non-uniformed employees in Newark were white, non-Hispanic, while 28.31% of the uniformed employees were white, non-Hispanic. According to the 2000 census data, 14.2% of Newark's general population is white, non-Hispanic.

[7] The six counties Meditz examined were Bergen, Essex, Hudson, Morris, Passaic, and Union. Based on the 2000 census data, the percentage of white, non-Hispanics in

6

specific data addressing the ethnic composition of government employees[8] and the private labor force[9] in each of the surrounding counties. The percentage of white, non-Hispanics in these positions greatly exceeded the number of white, non-Hispanics in Newark's non-uniformed work force. Meditz also provided employment statistics for Essex County governmental employees. Essex County has its county seat in Newark, and the composition of the Essex County and Newark non-uniformed workforces are comparable with regard to skill level and job function. Of the non-uniformed county workforce, 42.96% is white, non-Hispanic, according to the 2008 EEO-4 report. Meditz argued that the lower

---

Bergen County's general population is 72.3%; in Essex County's general population is 37.6%; in Hudson County's general population is 35.3%; in Morris County's general population is 82.0%; in Passaic County's general population is 51.5%; and in Union County's general population is 54.2%.

[8] Based on data gathered from 2005 Equal Employment Opportunity reports, the percentage of white, non-Hispanic government employees in Bergen County is 86.49%; in Essex County is 48.09%; in Hudson County is 48.09%; in Morris County is 84.37%; in Passaic County is 56.3%; and in Union County is 66.2%.

[9] Based on data gathered from 2005 Equal Employment Opportunity reports, the percentage of white, non-Hispanic employees in the private labor force in Bergen County is 55.18%; in Essex County is 46.05%; in Hudson County is 43.05%; in Morris County is 65.77%; in Passaic County is 50.24%; and in Union County is 53.31%.

percentage of white, non-Hispanic non-uniformed employees in Newark was caused by the residency requirement, and that absent a residency requirement, significantly more white, non-Hispanics would be employed by Newark. As a result, Meditz concluded that Newark's residency requirement disparately impacted him as a white, non-Hispanic who was denied a job with Newark.

The District Court granted Newark's motion for summary judgment, concluding that Meditz failed to prove his prima facie case. That is, based on the statistical evidence Meditz presented, the District Court concluded that "these statistics, standing alone, do not constitute sufficient evidence of a significantly discriminatory hiring pattern." In re Meditz v. City of Newark, No. 08-2912, 2010 WL 1529612, at *3 (D.N.J. Apr. 15, 2010). The District Court further concluded that there was no need to look beyond Newark's borders to define the relevant labor market, since "Newark is New Jersey's largest city with over 270,000 residents, 38,950 of whom are White. Given its diversity and large population, there is no need to redefine the relevant labor market past city limits for purposes of Title VII analysis." Id. at *4. We disagree with both conclusions of the District Court.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331; we have jurisdiction under 28 U.S.C. § 1291. [10]

---

[10] Meditz's Third Amended Complaint asserts seven counts. He avers constitutional claims, pursuant to both the federal and state constitutions, as well as a claim of disparate treatment. Meditz does not appeal the District Court's

8

We review the District Court's order granting summary judgment de novo. Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010). "To that end, we are required to apply the same test the district court should have utilized initially." Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009) (internal quotation marks omitted).

Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Nicini v. Morra, 212 F.3d 798, 805-06 (3d Cir.

---

decision granting summary judgment on those claims. Additionally, the Third Amended Complaint included claims made pursuant to New Jersey's Open Public Records Act and the common law right to access to public records (counts 6 and 7). Newark did not seek summary judgment on these claims. In its opinion, the District Court noted that it appeared that Meditz obtained the records he sought. However, the District Court did not dismiss these claims as moot. While both parties treated the District Court's order as final, the failure to address all counts of the complaint causes us to question the finality of the District Court's order, and thus our jurisdiction. However, our review of the entire record assures us that the records referenced in counts 6 and 7 of the Third Amended Complaint were, in fact, provided to Meditz, since several of his exhibits cite those records, thus rendering those claims moot. Ultimately, the failure to address counts 6 and 7 does not undermine either the District Court's ruling or our jurisdiction.

2000) (en banc) (citing Fed. R. Civ. P. 56(c)).[11]  "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Azur, 601 F.3d at 216.  In determining whether summary judgment is warranted "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Chambers ex rel. Chambers, 587 F.3d at 181.  "Further, '[w]e may affirm the District Court's order granting summary judgment on any grounds supported by the record.'"  Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009) (quoting Nicini v. Morra, 212 F.3d at 805).

### III.  Analysis

Meditz claims that Newark's residency requirement for non-uniformed employees has a disparate impact on white, non-Hispanics in violation of Title VII.  In support of his claim, he cites evidence of the relatively low percentage of white, non-Hispanics in Newark's non-uniformed work force.  The statistics he provides demonstrate that the percentage of white, non-Hispanics in Newark's non-uniformed work force is lower than the percentage that would be anticipated based on the percentage of white, non-

---

[11]  FED. R. CIV. P. 56 was revised in 2010.  The standard previously set forth in subsection (c) is now codified as subsection (a).  The language of this subsection is unchanged, except for "one word — genuine 'issue' bec[ame] genuine 'dispute.'"  Fed. R. Civ. P. 56 advisory committee's note, 2010 amend.

Hispanics in the population of the relevant labor market.

Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has long recognized that Title VII plaintiffs can make out a viable employment discrimination claim without alleging or proving discriminatory intent. See Griggs v. Duke Power, 401 U.S. 424 (1971). Under Title VII, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." Griggs, 401 U.S. at 430.

"The [Supreme] Court announced that these 'disparate impact' cases should proceed in two steps: (1) the plaintiff must prove that the challenged policy discriminates against members of a protected class, and then (2) the defendant can overcome the showing of disparate impact by proving a 'manifest relationship' between the policy and job performance. This second step came to be known as the 'business necessity' defense, and it serves as an employer's only means of defeating a Title VII claim when its employment policy has a discriminatory effect." El v. SEPTA, 479 F.3d 232, 239-40 (3d Cir. 2007) (footnotes omitted.) "[T]he successful assertion of the business necessity defense is not an ironclad shield; rather, the plaintiff can overcome it by showing that an alternative policy exists that would serve the employer's legitimate goals as well as the challenged policy with less of a discriminatory effect." Id. at 240 n.9.

11

Thus, "[i]n order to establish a *prima facie* case of disparate impact discrimination, a plaintiff is required to demonstrate that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern." N.A.A.C.P. v. Harrison, 940 F.2d 792, 798 (3d Cir. 1991) (citing Dothard v. Rawlinson, 433 U.S. 321, 329 (1977)). "The evidence in these 'disparate impact' cases usually focuses on statistical disparities." Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 987 (1988). "A comparison between the racial composition of those qualified persons in the relevant labor market and that of those in the jobs at issue typically 'forms the proper basis for the initial inquiry in a disparate impact case.'" Harrison, 940 F.2d at 798 (quoting Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 650-51(1989) (superceded by statute on other grounds)).

The Supreme Court has noted in several cases that statistics may serve to establish plaintiff's prima facie case. See, e.g., Watson, 487 U.S. at 991-95; Hazelwood School Dist. v. United States, 433 U.S 299 (1977). That is, "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." Hazelwood, 433 U.S. at 307-08. But, "[o]nce the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation." Watson, 487 U.S. 994-95. See also

12

Green v. USX Corp., 896 F.2d 801, 804 (3d Cir. 1990) (observing that "[t]he [Supreme] Court held that the plaintiff may not make out a prima facie discrimination case simply by showing a bottom line racial imbalance in the work force, or by identifying a number of allegedly discriminatory employment practices. Instead, the plaintiff must 'demonstrate that the [racial] disparity . . . is the result of one or more of the employment practices that they are attacking . . ., specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites.'" (quoting Wards Cove, 490 U.S. at 657)).

However, a key factor in assessing the statistics is ensuring that the court is using the correct basis for comparison. That is, "[w]hat the hiring figures prove obviously depends upon the figures to which they are compared." Hazelwood, 433 U.S. at 310.[12] To use the vernacular, we cannot compare apples to oranges. In Hazelwood, that was essentially what the district court did — it compared the percentage of minority teachers to the percentage of minority students, rather than comparing the

---

[12] The Supreme Court commented that there are cases where comparing the work force to the general population would be appropriate, such as cases involving unskilled labor. However, "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." Hazelwood, 433 U.S. at 308 n.13. See also Green v. USX Corp., 896 F.2d 801, 804-05 (3d Cir. 1990) (using applicant flow data for unskilled positions acceptable).

13

percentage of minority teachers in the Hazelwood school district to the percentage of minority teachers in the relevant labor market. The Supreme Court directed the district court, on remand, to evaluate the parameters of the appropriate "relevant labor market," including whether it should or should not include the city of St. Louis. The Court, after discussing statistical methodology, commented that those "observations are not intended to suggest that precise calculations of statistical significance are necessary in employing statistical proof, but merely to highlight the importance of the choice of the relevant labor market area." Id. at 311.

Similarly, we have addressed the question of what constitutes the relevant labor market. In Harrison, the Third Circuit examined Harrison's employment related residency requirement, and that policy's impact on the city's ability to hire minorities. Given that the city of Harrison had a very small minority population, limiting hiring to city residents almost assured having no minority employees. However, that fact alone was insufficient to establish plaintiff's prima facie case. In Harrison, we approved the District Court's methodology for defining the relevant labor market. The factors included geographical location, flow of transportation facilities, locations from which private employers in Harrison draw their work force, and commuting patterns. 940 F.2d at 799-801.

Here, in support of his prima facie case, Meditz offered statistical evidence showing that the percentage of white, non-Hispanics employed by Newark was lower than the percentage of white, non-Hispanics in the general population of Newark. Meditz also offered statistics showing the percentage of white, non-Hispanics in surrounding areas, both for the general population and for the private and

14

government work forces. Finally, Meditz offered evidence of the percentage of white, non-Hispanics employed by the Essex County government in Newark. Out of all of these percentages, the lowest was the percentage of white, non-Hispanics employed by the city of Newark. This compilation of statistics supported Meditz's claim that white, non-Hispanics were under-represented in Newark's non-uniformed work force.

The Supreme Court has set forth standards to be used as a basis for evaluating statistical evidence in disparate impact claims. Relying on the statistical standards developed in jury analysis cases, the Supreme Court suggested that "fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to race." Hazelwood, 433 U.S. at 311 n.17.[13] Assuming for the moment that the District

_____

[13] "The measure of the predicted fluctuations from the expected value is the standard deviation." Castaneda v. Partida, 430 U.S. 482, 496 n.17. "A standard deviation analysis would proceed as follows: Creating a jury list would be similar hypothetically to stocking a shelf with 100 pens randomly selected from a batch of 1000 pens, 700 of which are blue and 300 of which are red. The expected number of blue pens would be 700 x .1 or 70 pens and the expected number of red pens would be 300 x .1 or 30 pens. However, there is a certain probability that random selection would yield a different result. The standard deviation calculation measures how likely it is that a deviant result occurred by chance. In the above example, the standard deviation is the square root of the product of the number of pens shelved (100) times the probability of drawing a red pen (0.3) times

Court was correct and the relevant labor market is the population of the city of Newark, the difference between the two percentages is slightly over six standard deviations, far in excess of the Supreme Court's suggested standard of two or three standard deviations.[14]  This difference appears to establish a prima facie case.[15]

---

the probability of drawing a blue pen (0.7). Here, that number is 4.6 pens. Each standard deviation results in a substantially reduced probability that the result occurred by random chance. In our example, the probability that 20 red "pens and 80 blue pens would be randomly shelved is less than 5 percent." Ramseur v. Beyer, 983 F.2d 1215, 1232 n.17 (3d Cir. 1992).

[14] Using the percentage of white, non-Hispanic government employees in Essex County results in a difference of slightly over 34 standard deviations.  Our use of the Essex County government employees figure does not reflect any view on the composition of the relevant labor market.

[15] "[A] plaintiff must also prove causation. . . . 'As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case in a disparate-impact suit under Title VII.'" N.A.A.C.P. v. Bayonne, 134 F.3d 113, 124 (3d Cir. 1998) (quoting Wards Cove, 490 U.S. at 657).  In Bayonne, the court noted that "[c]ausation presents a question of fact." Id. at 119.  The District Court never discussed the issue of causation since it

16

Despite this statistical evidence, the District Court concluded that Meditz failed to prove his prima facie case because the difference between the percentage of white, non-Hispanics employed by the city (9.24%) compared to the percentage of white, non-Hispanics living in the city (14.2%), did "not constitute sufficient evidence of a significantly discriminatory hiring pattern." Meditz, 2010 WL 1529612, at *3. Given this bald conclusion, it is not clear what methodology or statistical analysis the District Court employed. Notably, the District Court made no reference to the standard deviation analysis recommended by the Supreme Court.

Before the District Court can reach the statistical analysis, it must make a determination as to the parameters of

concluded that the statistics did not support Meditz's claim. Here, Meditz is challenging a residency requirement. In such a case, if the geographic limits of the relevant labor market are the same as those imposed by the residency requirement, then comparison between the racial composition of the relevant labor market and the racial composition of the employer's workforce will not necessarily explain causation. Any statistically significant disparity between the two populations most likely will not be the result of the residency requirement because all members of the relevant labor market would meet the requirement. Put differently, if every person that the employer could reasonably recruit (i.e., the relevant labor market) meets the residency requirement, then the requirement can have no effect—racial or otherwise—on the employer's hiring. Therefore, comparison to other factors will be necessary in order to demonstrate causation.

17

the relevant labor market. See Hazelwood, 433 U.S. at 313. In conducting this analysis, the District Court should consider the factors set forth in Harrison, including geographical location, flow of transportation facilities, locations from which private employers draw their workforce, and commuting patterns.[16] Harrison, 940 F.2d at 799-801.

In Harrison, this Court concluded that the factors considered by the district court in determining what geographical area constituted the relevant labor market were reasonable. 940 F.2d at 801. The District Court here focused on the fact that the population of Harrison, at the time of this Court's decision in that case, included few blacks, and Harrison employed no blacks. By comparison, according to the District Court here, the fact that Newark employed 180

---

[16] In support of his proposed definition of the relevant labor market, Meditz offered his own affidavit stating that the "City of Newark is within reasonable commuting distance to Essex, Bergen, Hudson, Union, Morris & Passaic counties," and that his current residence, East Rutherford, was only seven miles from the City of Newark. Additionally, he offered employment data obtained from Newark, which showed that, due to waivers of the residency requirement, 185 of Newark's 1,949 non-uniformed employees resided outside of the City of Newark. Finally, the government of the County of Essex—an employer similar in many respects to the City of Newark—has an office in Newark but does not require its employees to be residents of Newark. Newark has not contested any of these factual assertions. This evidence strongly suggests that the relevant labor market is not limited to the City of Newark.

white, non-Hispanics, far more than Harrison's employment of zero blacks, sufficed to demonstrate a lack of discrimination.

The District Court misinterpreted Harrison. Rather than reading Harrison as setting forth appropriate criteria to consider in determining the relevant labor market, the District Court read Harrison to stand for the proposition that the only reason to look outside the city limits is a lack of minorities within the city.

We will remand so that the District Court can determine the relevant labor market, relying on the criteria set forth in Harrison, and then conduct a complete and correct statistical analysis,[17] comparing the makeup of Newark's non-uniformed labor force with the similarly skilled labor force in the relevant labor market.

To the extent the District Court concluded that, even if Meditz established a prima facie claim of disparate impact, Newark is still entitled to summary judgment because the city has met the requirements of the business necessity defense, we further reverse the Court on this point. We agree with Meditz that the District Court applied the incorrect standard.

The District Court focused only on whether the business justifications offered by Newark had any connection

---

[17] The statistical analysis should include the calculation of the standard deviation between the number of white, non-Hispanics employed by Newark, and the number of white, non-Hispanics in the relevant labor market, rather than a subjective view of the relative percentages.

19

to the residency policy even if unrelated to Meditz's ability to perform the job in question. The District Court mistakenly relied on this court's opinion in Harrison that in turn relied on the Supreme Court's definition of business justification in Wards Cove. The Civil Rights Act of 1991 abrogated the decision in Wards Cove, and returned the business necessity defense to the standard that existed prior to the date of the decision in Wards Cove. El, 479 F.3d at 241.

Since the enactment of the Civil Rights Act of 1991, we have not had the occasion to consider the business necessity defense in a case involving a challenge to an employment related residency requirement. However, in El, we carefully considered the evolution of the business necessity defense, and concluded "that hiring criteria must effectively measure the 'minimum qualifications for successful performance of the job in question.' This holding reflects the Griggs/Albemarle/Dothard rejection of criteria that are overbroad or merely general, unsophisticated measures of a legitimate job-related quality. It is also consistent with the fact that Congress continues to call the test 'business necessity,' not 'business convenience' or some other weaker term." El, 479 F.3d at 242 (quoting Lanning v. SEPTA, 181 F.3d 478, 481 (3d Cir. 1999)).

It is this standard, and not the standard set forth in Harrison, that the District Court must address on remand. We note that even under the "diluted"[18] business necessity

---

[18] "Although Wards Cove arguably diluted the business necessity burden imposed upon the defendant under prior case law, it did not reduce the defendant's burden to a showing of mere rationality. While it is now clear that the employer need not show that a challenged practice is

defense applied in <u>Harrison</u>, this Court found the reasons proffered by the city of Harrison to be "insubstantial" and not "supported by objective evidence demonstrating a nexus between [the] residency ordinance and any specific employment goal." <u>Harrison</u>, 940 F.2d at 805. The business necessities we rejected in <u>Harrison</u> are strikingly similar to the justifications offered by Newark here. Unlike the city of Harrison, which offered testimony in support of its business necessity defense, Newark provides scant support or explanation for its proffered business necessities. On remand, if the District Court reaches the question of business necessity, it should analyze the evidence offered by Newark in support of its position, and not simply conclude that "[t]his Court is satisfied that Defendant has objectively demonstrated a nexus between its residency ordinance and its employment goals." <u>Meditz</u>, 2010 WL 1529612, at *4.

## IV.    Conclusion

Based upon our de novo review, we conclude that summary judgment was not appropriate on this record. Factual issues exist as to how to define the appropriate relevant labor market. Even if the city of Newark itself is the relevant labor market, the District Court erred in its statistical analysis. Further, the District Court applied the incorrect standard when analyzing the business necessity defense. On remand, the correct standard should be considered. We will remand this case for further proceedings consistent with this opinion.

---

absolutely necessary, it *must* demonstrate that the practice furthers legitimate business goals." <u>Harrison</u>, 940 F.2d at 803 (citations omitted, emphasis in original).

21