**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2096
_____


DR. FADI CHAABAN; DR. SABINO R. TORRE;
DR. CONSTANTINOS A. COSTEAS;
DR. ANTHONY J. CASELLA,
as Trustees of Diagnostics & Clinical Cardiology, P.A. Profit Sharing Plan


v.


DR. MARIO A. CRISCITO,
                                        Appellant


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2:08-cv-01567)
District Judge: Honorable Garrett E. Brown, Jr.

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
March 6, 2012


Before: SCIRICA, AMBRO, and VAN ANTWERPEN, Circuit Judges

(Filed: March 7, 2012)


_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, Circuit Judge.

The current Trustees of the Diagnostics & Clinical Cardiology, P.A. Profit Sharing Plan (the "Plan") filed suit alleging that Dr. Mario Criscito ("Criscito"), the trustee of the Plan until 2007, violated the fiduciary duties he owed to the Plan participants under the Employee Retirement Income Security Act ("ERISA"). The District Court granted the Trustees' motion for summary judgment, denied Criscito's motion for summary judgment, and awarded the Trustees $4,117,464.65. Criscito appeals the decision. We will affirm the District Court.[1]

## I.

We write only for the parties and assume their familiarity with the factual and procedural history of this case. Accordingly, we will state only those facts essential to resolving this dispute. Criscito formed the Plan for Diagnostics & Clinical Cardiology ("DCC") in 1975, and served as its trustee from its inception until 2007. This position imposed fiduciary duties on Criscito in his management of the Plan. *See* Eric D. Chason, *Redressing All ERISA Fiduciary Duties Under § 409(a)*, 83 TEMP. L. REV. 147, 150 (2011) ("ERISA creates a fiduciary relationship with respect to any 'employee benefit plan' or simply 'plan,' which provides either 'pension' or 'welfare' benefits.").

The suit filed by the Trustees focuses on a sale of stock by Criscito in January of 2000, when he was the Plan's trustee. At that time, the Plan consisted of two types of

---

[1] We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, to the extent it is a final decision of the District Court. *See* section II.C *infra* discussing failure to seek District Court review of Magistrate Judge's order.

accounts. The first was a commingled account where assets were held in a single account with each participant owning a portion of the account's assets. The second was an individual account, which participants owned in the entirety. The two large commingled accounts that are the focus of this suit were the "Morgan Stanley Account" and the "Smith Barney Account." In January 2000 Criscito decided to do away with the commingled accounts in favor of creating individual accounts for each participant.

Before the commingled accounts were split into individual accounts, Criscito sold the stock in the Morgan Stanley Account near the peak of the "tech bubble" in January of 2000. The assets in the Account were worth $12,952,936.42 at the end of 1999,[2] but Criscito reported to the third-party administrator, American Pension Corporation ("APC"), that the balance of the account was $4,017,942.57.[3] (*Compare* Appendix ("App."). at 74 (statement showing balance in Morgan Stanley Account of $12,952,936.42) *with* App. at 82 (Criscito fax to APC stating balance of Morgan Stanley Account was $4,017,942.57) and App. at 658–66 (APC's 1999 year-end report reflecting

_____

[2] The 1998 year-end statement for the Morgan Stanley Account shows a value of $2,355,460.58. App. at 72. In 1999, however, the price of "Veritas Software" stock increased drastically, from $59 15/16 on December 31, 1998, to $143 1/8 on December 31, 1999. Throughout this period purchases were made, increasing the number of shares in the Account from 7,875 at the end of 1998 to 67,125 at the end of 1999. *Compare* App. at 72 *with* App. at 74. This stock was subsequently sold between January 5 and 12, 2000, at prices ranging from a high of $140 3/8 to a low of $110 3/8. App. at 80. Although other assets were in the Account, this stock accounted for a majority of the value in the Account.
[3] Criscito owned roughly 88% of the two commingled accounts, so a large portion of the roughly $8.9 million that he understated belonged to himself. Criscito also understated the value of the Smith Barney account by about $3.1 million. *Compare* App. at 83 and App. at 1129 (1999 year-end value of $3,924,549.92) *with* App. at 82 (report to APC that 1999 year-end value was $798,425.50).

3

this information)).  Criscito's mendacious reports understated the value of each individual's portion of the Morgan Stanley Account, and so the participants received smaller transfers into their individual accounts when the transition occurred.

Criscito was able to do this because he exercised complete control over the Plan and its accounts.  He instructed both APC and Morgan Stanley employees that they were not permitted to speak to anyone other himself, and requested that all information be sent only to his home address.  App. at 676–82.  This even included a threat by Criscito that he would go to APC and "beat" an APC employee if any information regarding the Plan went to the DCC office or to Casella.[4]  App. at 679.  When Criscito provided APC with the year-end numbers, he did so either verbally or by providing documents which he created.  App. at 533 & 674.  He did not provide copies of statements from the accounts. APC used the inaccurate information it was given by Criscito to prepare the Form 5500 for the Plan, and Criscito signed these forms and submitted them to the IRS.  Criscito proceeded to use the balance of the Morgan Stanley Account for personal transactions. These transactions are detailed at length in the Trustee's brief, pages 17–25, and included withdrawals that Criscito admits were for personal use, as well as transfers to other accounts in Criscito's name, trusts, real estate investments, and resorts in South Florida.

Criscito succeeded in concealing his actions.  For example, Mark Brown, DCC's administrator, requested information regarding his balance in the commingled account in 1999.  Representatives from both APC and Morgan Stanley informed Brown that they

_____

[4] The employee did not believe he was being physically threatened; rather he was under the impression that if the information went to DCC or Casella, APC would be fired.  App. at 639–40.

could not release information to him; only Criscito could access the information Brown was seeking. App. at 688–90. When Brown sought the information from Criscito, he was told "Don't ask Mario. You're fine. Uncle Mario is taking care of you," before being given a balance on a napkin. App. at 689. The degree of Criscito's control is also shown by the fact that the new Trustees did not discover his fraudulent actions in dealing with the Morgan Stanley Account until he was removed as the Plan's trustee in 2007. Criscito provided no documentation to the new Trustees and only after analyzing and piecing together the information APC had on file were the new Trustees able to discover Criscito's fraudulent scheme. During this review by the Trustees, it was also discovered that APC received a copy of a March 2000 statement from Morgan Stanley that disclosed the full value of the account. APC possessed this statement but never opened it or discovered the discrepancy.

Criscito states that he did not deprive the participants of their funds; rather, he kept them invested in the Smith Barney Account even while he was transferring monies from that Account. (Appellant's Br. at p.9.) This directly conflicts, however, with the lawsuit he has filed in New Jersey state court asserting full ownership of the assets of the Account. App. at 1385 ¶50; 1386 ¶55; 1390 ¶13.

The District Court found no genuine issues of material fact regarding the Trustees' suit, granted their motion for summary judgment, and awarded them damages. It also denied Criscito's motion for summary judgment. Criscito timely appealed.

**II.**

5

On appeal, Criscito argues that the District Court erred: (1) in denying his motion to dismiss as well as his motion for summary judgment on the grounds of the statute of limitations; (2) in granting summary judgment to the Trustees; (3) in failing to allow him to implead APC as a third-party defendant; and (4) in its calculation of compensatory damages. We reject Criscito's arguments, and will affirm.

## A.

We review the District Court's denial of Criscito's motion to dismiss and motion for summary judgment *de novo* and apply the same standard as that Court. *Meditz v. City of Newark*, 658 F.3d 364, 369 (3d Cir. 2011). A motion to dismiss is granted if the complaint fails to state a claim upon which relief may be granted; failing to satisfy the statute of limitations is one such ground. Fed.R.Civ.P. 12(b)(6); *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002). When reviewing a motion to dismiss, we accept all allegations in the complaint as true and view them in the light most favorable to the plaintiff. Summary judgment is granted only "where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). We must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" Trustees, since they are the party opposing the motion. *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)

ERISA has a statute of limitations for bringing actions against fiduciaries. 29 U.S.C. § 1113.[5] "This section [] creates a general six year statute of limitations,

---

[5] 29 U.S.C. § 1113 reads:

shortened to three years in cases where the plaintiff has actual knowledge of the breach, and potentially extended to six years from the date of discovery in cases involving fraud or concealment." *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 201 (3d Cir. 2006).

The "fraud or concealment" exception is the focus here. This exception aims to "codify a portion of the common law for ERISA breach of fiduciary duty claims." *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 502 (3d Cir. 2001) ("*Unisys III*") "The issue raised by this provision is not simply whether the alleged breach involved some kind of fraud but rather whether the fiduciary took steps to hide its breach so that the statute should not begin to run until the breach is discovered." *Id.* Simply alleging a "complaint [that] 'sounds in concealment'" is insufficient; a plaintiff must show "evidence that the defendant took affirmative steps to hide its breach of fiduciary duty." *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir. 1996).

The Trustees' complaint alleges that Criscito misreported the value of the Plan's assets in order to misappropriate these assets for his own use on or about January 13, 2000. The Trustees state that they did not discover these actions until July 2007, when

---

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

Criscito was removed from his position as trustee of the plan and they took over as trustees.

Based upon the following undisputed material facts, we conclude that Criscito's actions constitute "fraudulent concealment." When the Trustees removed Criscito as trustee of the Plan, he provided them with no documentation of his activities for the thirty years he was the trustee. The new Trustees were forced to consult the files of APC and other sources in order to piece together the financial transactions taken by Criscito. It was only at this point that it became clear that Criscito had submitted false information to APC regarding the division of the Morgan Stanley Account.[6] This fraud is made plain by the fact that Criscito signed the Forms 5500 for the Plan, containing the false information he provided to APC, and submitted them to the IRS.

While this fraud was occurring, Criscito insisted that APC send all information regarding the Plans only to his home address. He instructed APC employees that they were not permitted to speak to anyone other than himself about the Plans, and multiple documents from the APC file confirm these instructions. App. at 676–82. Criscito succeeded in hiding his actions, as they went undiscovered until 2007.

The incident with Brown is illustrative of the effects of Criscito's control of the information pertaining to the value of the Plan's assets. Had Brown been provided the true value of his portion of the Morgan Stanley Account when he asked for it in 1999, he would have known of Criscito's deception when his individual account was set up and

---

[6] As mentioned earlier, Criscito either verbally submitted the numbers, or provided documents which he created. He did not provide APC with the actual statements showing the balances in the various accounts.

contained a smaller balance than he had previously been told. This incident is indicative of the affirmative acts Criscito took to hide the full value of the commingled accounts. He alone could access the information, and with this power he provided erroneous balances to the individuals with interests in the commingled accounts, like Brown. This, in turn, allowed Criscito to understate the 1999 year-end balance[7] and distribute smaller balances to the plan participants than they were entitled to.

Criscito's broad response is that he did not actively conceal any information from the Trustees, nor did he take any fraudulent actions while he was trustee of the accounts. More narrowly, he states that APC possessed the true values of the brokerage accounts as of March 2000, which it received directly from Morgan Stanley,[8] and failed to cross-check the figures on the brokerage accounts with the figures Criscito earlier provided to APC. Because APC possessed the real values that showed discrepancies, Criscito contends he cannot be considered to have actively concealed his actions. Further, Criscito argues that the Trustees did not exercise due diligence regarding their investments. Instead they "willfully blind[ed] themselves to the truth and [now] claim to have been defrauded."

Criscito's attempt to shift the blame for his actions to APC and the Trustees is unavailing. The record makes clear that Criscito (1) fraudulently misreported the account

---

[7] Since APC relied upon the asset values provided in the 1999 Form 5500 to calculate the value of the Forms 5500 from 2000 to 2005, this misrepresentation affected many documents.

[8] This disclosure was inadvertent, as Criscito informed Morgan Stanley that no information was to be sent directly to APC or anyone else. Again, Criscito demanded that only he have access to the information. App. at 690.

9

balance of the commingled account at the end of 1999, (2) transferred monies from the commingled account to the individual accounts that did not represent each individual's full interest in the commingled account, and (3) exerted such control over the activities and information of the Plan that he was able to hide his fraudulent actions for years. As a result, the "fraud or concealment" exception in § 1113 applies in this case and the Trustees complaint was not barred by the statute of limitations. The decisions by the District Court to deny Criscito's motion to dismiss, as well as his motion for summary judgment, were proper and will be affirmed.

### B.

We now turn to Criscito's claim that the District Court erred in granting the Trustees' motion for summary judgment. Under 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), the Trustees may file a civil action for damages. Section 1109(a) states that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." We have previously distilled these sections and stated the elements of such a claim are "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007).[9]

---

[9] The relevant ERISA duties are set forth in 29 U.S.C. § 1104(a)(1)(B) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .") and

It is clear that Criscito was a plan fiduciary. Despite protestations by Criscito, it is also clear the Trustees have demonstrated that the absence of a genuine dispute regarding whether Criscito breached his ERISA-imposed duty or caused a loss to the plan. As discussed above, the facts demonstrate that Criscito violated the fiduciary duties he owed to the Plan's beneficiaries by fraudulently reporting inaccurate account balances to APC and the beneficiaries, improperly distributing the Plan's assets, and using the assets for his personal benefit. These fraudulent actions resulted in a loss when the Plan participants received an amount smaller than their proportionate shares in the Morgan Stanley Account. The Trustees satisfied their burden of demonstrating no genuine disputes as to the material facts regarding this claim, and on these facts they are entitled to judgment as a matter of law.

## C.

Criscito argues that the District Court abused its discretion in failing to grant him leave to file a third-party complaint against APC. The Trustees reply that because the decision was made by Magistrate Judge Arleo and Criscito did not ask the District Judge to review the decision, Magistrate Judge Arleo's order is final. *Continental Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 250 (3d Cir. 1998) ("As a general rule, we do not consider on appeal issues that were not raised before the district court in the absence of exceptional circumstances."). In his reply brief, Criscito concedes that "[t]he

---

§ 1106(b)(1) ("A fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account . . . .").

11

[Trustees] are correct from a procedural standpoint." Accordingly, we will not address the issue.

## D.

We now turn to Criscito's claim regarding prejudgment interest. We have held awarding prejudgment interest furthers the remedial purposes of ERISA. *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3d Cir. 1992). We review the District Court's computation of damages and the interest on those damages for abuse of discretion. *Skretvedt v. E.I. Dupont de Nemours*, 372 F.3d 193, 205–06 (3d Cir. 2004) (applying to ERISA "the long-standing rule that, in the absence of an explicit statutory command otherwise, district courts have broad discretion to award prejudgment interest on a judgment obtained pursuant to a federal statute"); *see also Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) ("In a suit to enforce a right under ERISA, the question of whether or not to award prejudgment interest is ordinarily left to the discretion of the district court. . . . Since prejudgment interest is an element of the plaintiff's complete compensation, the same considerations that inform the court's decision whether or not to award interest at all should inform the court's choice of interest rate." (internal quotations and citations omitted)).

> ERISA fiduciaries who breach the duties imposed upon them are
>
> personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . .

29 U.S.C. § 1109(a).

12

Here, the District Court calculated the principal removed from the plan by Criscito to be $1,681,572.65. App. at 1433. The Court added $2,418,292 in interest and $17,600 in clerical costs. *Id.* The amount of interest was calculated using the Voluntary Fiduciary Correction Program Online Calculator ("VFCP calculator") provided by the Department of Labor. DEP'T OF LABOR, *Voluntary Fiduciary Correction Program Online Calculator with Instructions, Examples and Manual Calculations*, http://www.dol.gov/ebsa/calculator/. The VFCP calculator is approved by the Department of Labor and uses rates calculated by the Internal Revenue Service to determine the "Lost Earnings" of ERISA plan beneficiaries. Voluntary Fiduciary Correction Program Under the Employee Retirement Income Security Act of 1974, 71 Fed. Reg. 20262, 20272 (proposed Apr. 19, 2006). The "Lost Earnings" amount "is intended to approximate the amount that would have been earned by the plan on the Principal Amount, but for the Breach." *Id.* at 20271, § 5(b)(5).

Criscito attacks the damage award on several grounds. First, he argues that the District Court erred in assuming that he "stole" roughly $1.68 million from the commingled accounts. We have already stated above, in the context of the parties' motions for summary judgment, that the Trustees have shown there is no genuine dispute regarding whether Criscito fraudulently took money that belonged to other investors in the Plan. Given this finding, as well as our review of the evidence submitted by the parties, we agree with the District Court's calculation of the amount of principal that Criscito did not transfer into the individual accounts of the Plan participants.

13

Criscito's second line of attack focuses on the Smith Barney Account. He asserts that the Smith Barney Account belongs to the Plan and that the value of it reflects amounts that still belong to the Plan participants. But, Criscito has asserted in New Jersey state court that he is the rightful owner of the Smith Barney Account, which contradicts his argument in this case. App. at 1385 ¶50; 1386 ¶55; 1390 ¶13. The Trustees below stated that it was "crystal clear that no Plan participant other than Criscito had an interest in the Smith Barney Account after December 31, 1999." Because there is no evidence that others possessed an interest in the Smith Barney Account, it cannot be used to reduce Criscito's liability.

Finally, Criscito argues it was inappropriate for the District Court to use the VFCP calculator because it was "designed to provide a 'safe harbor' whereby a fiduciary may voluntarily remedy a breach of fiduciary duty, and thereby avoid civil or criminal liability." He points to the regulations promulgated by the Department of Labor regarding the purpose of the program, and the amount to be restored for participant-directed accounts. Adoption of Voluntary Fiduciary Correction Program, 67 Fed. Reg. 15066 (March 28, 2002) ("The VFC Program is structured to make the plan whole without the need for investigation and suit and the costs attendant thereto in exchange for relief from penalties under section 502(l)."); *Id*. at 15074 ("For a participant-directed defined contribution plan, the Lost Earnings to be restored to the plan is the amount that each participant would have earned on the Principal Amount from the Loss Date to the Recovery Date.").

14

We believe that the District Court did not abuse its discretion in using the VFCP calculator in this case.  No one can determine the rate of return the individual participants would have earned had Criscito distributed to each individual his or her full share of the Morgan Stanley Account, because no one knows with certainty what actions the individuals would have taken had they received their fair share of the accounts.  But yet the district courts are tasked with coming up with an interest rate to award prejudgment interest.  Because of this inherent difficulty, the district courts have "broad discretion" in resolving the problem.  *See Skretvedt*, 372 F.3d at 205–06.

The use of the VFCP calculator was an appropriate way for the District Court to resolve the problem of calculating damages.  Other district courts faced with this problem have also used this calculator.  *See Hawaii Carpenters Trust Funds vs. TNT Plastering & Stucco, Inc.*, Civ. No. 10-00352, 2011 WL 613695, at *7 (D. Haw. Feb. 11, 2011) (stating that plaintiffs would be entitled to full amount under VFCP calculator if they had requested it); *Trs. of the Plumbers Local Union No. 1 v. Philip Gen. Constr.*, No. 05-CV-1665, 2007 WL 3124612, at *12 (E.D.N.Y. Sept. 12, 2007) (stating that using VFCP calculator "appears to be reasonable" and using it to determine the plaintiffs lost earnings).  We need not address Criscito's proposed alternative calculations because the question before us is not whether the District Court calculated the damage in the best way possible; it is whether using the VFCP calculator was an abuse of discretion.  We hold that the District Court did not abuse its discretion in determining the different components of its compensatory damages award given the facts of this case.

**III.**

15

For the foregoing reasons, the District Court properly (1) denied Criscito's motion to dismiss and motion for summary judgment, (2) granted the plaintiffs' motion for summary judgment, and (3) calculated the damages. Accordingly, we will affirm the District Court's opinion in all respects.